STATE OF NORTH CAROLINA v. TIMOTHY RAY TANN

No. 141

(Filed 27 January 1981)

1. Constitutional Law § 50— speedy trial — factors considered

Interrelated factors to be considered in determining whether an accused has been denied his constitutional right to a speedy trial are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to defendant resulting from the delay.

2. Constitutional Law § 52— speedy trial — requirement that delay be arbitrary and oppressive

Delays in violation of the constitutional right to a speedy trial are those undue delays which are arbitrary and oppressive or the result of deliberate prosecution efforts "to hamper the defense."

3. Constitutional Law § 52— speedy trial — burden of proof

The burden is on an accused who asserts denial of his constitutional right to a speedy trial to show that the delay was due to the neglect or willfulness of the prosecution.

4. Constitutional Law § 51— eight month delay between arrest and trial — no denial of speedy trial

A defendant charged with first degree burglary was not denied his constitutional right to a speedy trial by the delay of less than eight months from the time of his arrest to commencement of his trial where the record shows that a portion of the delay was due to defendant's motion for a mental examination to determine his competency to proceed; further delay was occasioned when defendant's counsel withdrew due to irreconcilable differences between counsel and defendant; a short delay on another occasion was caused by the inability of an officer to be present; and the case was calendared one or more times for trial but not reached due to the length of the calendar.

5. Criminal Law §§ 66.5, 66.10, 66.15— pretrial showup identification — absence of counsel — no likelihood of irreparable misidentification — in-

**court identification — independent origin**

The trial court properly admitted a burglary victim's in-court identification of defendant and evidence of the victim's identification of defendant in a one-man showup conducted at the victim's home within an hour after the crime and at a time when defendant was without counsel and had not waived counsel where the evidence on *voir dire* tended to show that when the victim awoke on the night in question a man was standing over her with his hand on her thigh; the man left through a window and the victim watched him crawl on his knees to the corner of her house where he stood up and then left; the victim was able to see the man's face when he stood up because there was a street light located in the back yard; the victim recognized the man as a person known to her as "Rayboy"; the victim told officers the man was wearing a light colored shirt and light colored pants and had an Afro hairdo; officers knew that defendant was known as "Rayboy"; officers then went to defendant's home and found him lying on a couch wearing a light colored shirt and light colored pants which were wet below the knees and had grass stains on the knees; defendant agreed voluntarily to accompany the officers to the victim's residence where he was identified by the victim; and defendant had not been arrested and was not in custody at the time he was identified at the victim's home, since (1) defendant was not entitled to counsel at the one-man showup because he was not in custody, (2) there is no reasonable possibility that the one-man showup could have led to a mistaken identification or contributed to defendant's conviction, and (3) the in-court identification of defendant by the victim was independent in origin and was not influenced by the showup.

**6. Criminal Law § 75.9— volunteered in-custody statements**

In-custody statements volunteered by defendant after he had waived his constitutional rights and while he was being taken by automobile from the magistrate's office to the police station, "Man, you can't do this to me. That lady don't know what time I broke into her house," were properly admitted in defendant's trial for first degree burglary.

Justice MEYER took no part in the consideration or decision of this case.

DEFENDANT appeals from judgment of *Bruce, J.*, 7 April 1980 Criminal Session, EDGECOMBE Superior Court.

Defendant was tried and convicted upon a bill of indictment charging him with first degree burglary on the night of 2 September 1979, when he allegedly broke into and entered the occupied dwelling of Annie Brooks located at 1508 Springbrook Drive in Rocky Mount, N.C., with intent to commit rape.

The State offered evidence tending to show that on the night in question Annie Brooks was awakened at approximately 2 a.m. by a man standing over her bed with his hand on her thigh. She yelled "Who are you!" and the man "turned around fast and went out the bedroom window." The window had been left open that night due to hot weather, but the screen was intact when Mrs. Brooks went to

bed. It was later discovered that the screen had been torn or cut. Mrs. Brooks rushed to the window and saw the intruder fall on the wet grass. He crawled about twenty feet to the corner of the house and stood up. In the words of Mrs. Brooks:

> I saw his face. I could see the type of clothes he was wearing. I know who he was. I knew him to be Rayboy. I had seen him before. He lives down the street from me not far from my house. I have been down to the house where he lives. All I knew about him was his name was Rayboy. When he got to the corner of my house, he straightened up and ran around the house. He had to run because he knew I saw him.

Police officers were called immediately. When they arrived, Mrs. Brooks told them the intruder was a man she knew as "Rayboy." She said she had no doubt that it was Rayboy; that he lived in the community and she had seen him on other occasions; that his hair was bushed, and that he was wearing "real light" clothing. Mrs. Brooks had never heard the name "Timothy Ray Tann," but the officers knew that Timothy Ray Tann was known as "Rayboy." Within less than an hour, they brought the defendant Timothy Ray Tann to the Brooks residence and Mrs. Brooks identified him as the individual who had been in her bedroom.

Officer Parks testified that he and Officer Moss immediately went to the home of defendant's mother and were admitted. They found defendant lying on the couch fully clothed except for his shoes. Defendant willingly accompanied the officers to the Brooks residence at 1508 Springbrook Drive. The officers wanted Mrs. Brooks to see defendant to make sure that "we were talking about one and the same person." Defendant was dressed in a light colored shirt and off-white pants. The pants were wet below the knees with grass stains on the knees.

The State's evidence further tends to show that defendant had been living about a year at the home of Catherine Davis, a friend of Mrs. Brooks, the third or fourth house from the Brooks residence on Springbrook Drive. Mrs. Brooks had seen defendant at least twice at the Davis home.

Defendant testified he was twenty-five years old and had been living in a rented room in the home of Catherine Davis on Spring-

brook Drive for about a year. He said he and Mrs. Brooks were friends; that he had seen her at the Catherine Davis house about every weekend; that she asked for liquor and beer on many occasions but he would not give her any; that she used to go with a man named Hiawatha who also lived at the Davis house.

Defendant gave a detailed account of his whereabouts on 1 September until 11:15 p.m. when he went to his mother's home, kicked off his shoes and lay down on the couch. He remained there until the officers came sometime during the early morning hours and took him away. He denied that he had been to the home of Mrs. Brooks that night until the officers took him there. His testimony was corroborated by the testimony of his mother that she had asthma and sat up all night in the same room where defendant was lying on the couch. She testified defendant did not leave her home from 11:15 p.m. on the night in question until the officers came and took him away.

Defendant admitted he had been convicted of manslaughter, felonious breaking and entering twice, and larceny.

Defendant was convicted of burglary in the first degree and sentenced to life imprisonment. He appeals to this Court assigning errors discussed in the opinion.

*Rufus L. Edmisten, Attorney General, by Fred R. Gamin, Associate Attorney, for the State.*

*William A Pully, Attorney for defendant appellant.*

HUSKINS, Justice.

Defendant moved to dismiss the charges against him on the ground that his constitutional right to a speedy trial had been denied. Denial of the motion constitutes his first assignment of error.

Defendant filed no affidavits or other evidentiary matter to support the conclusory assertions contained in his motion to dismiss. An examination of the record reveals the following chronology of events:

1. The crime was committed and defendant was arrested on 2 September 1979.

2. A probable cause hearing was set for 20 September 1979,

but on that date defendant, through counsel, moved for a mental examination to determine his competency to proceed. In consequence thereof, the probable cause hearing was not held, and defendant was sent to Dorothea Dix Hospital for a mental examination.

3. The mental examination was completed on 5 October 1979. Defendant was found competent to proceed, and the psychiatric report to that effect was filed with the court on 10 October 1979.

4. On 18 October 1979, Quentin T. Sumner, defendant's original counsel, was allowed to withdraw due to irreconcilable differences between him and defendant. Attorney William A. Pully was thereupon appointed to represent defendant.

5. On 13 December 1979, a probable cause hearing calendared for that date was continued on motion of the State to 17 December 1979 due to the absence of an officer. Defendant's motion to dismiss at the close of the hearing was denied.

6. On 17 December 1979, a probable cause hearing was conducted, and defendant was bound over to superior court for trial.

7. On 7 January 1980, defendant's counsel, William A. Pully, moved for the appointment of an additional lawyer to assist him. The motion was allowed on 11 January 1980, and H. Vinson Bridgers was appointed as additional counsel.

8. On 11 January 1980, defendant moved to dismiss on the ground that his constitutional right to a speedy trial had been denied.

9. On 14 January 1980, the Grand Jury returned a true bill of indictment against defendant.

10. On 15 January 1980, defendant appeared for arraignment and entered a plea of not guilty. His motion to dismiss for want of a speedy trial was denied and the case was calendared for trial on 19 February 1980 but not reached at the February session of superior court.

11. On 7 April 1980, defendant was tried, convicted and sentenced.

12. On 9 April 1980, defendant filed his second motion to dismiss for failure to grant a speedy trial. He asserts in that motion,

with no evidence to support it, that his probable cause hearing was calendared no less than four times in district court and continued three times by the State; that the case against him had been calendared three times in superior court before it was finally brought to trial on 7 April 1980. The record shows none of these things, but we shall assume *arguendo* that they are true.

13. On 16 April 1980, defendant's motion to dismiss because he was denied a speedy trial was denied by the court, and defendant excepted.

On the basis of the record before us, we think defendant's motion to dismiss on speedy trial grounds was properly denied.

**[1]** Interrelated factors to be considered in determining whether an accused has been denied his constitutional right to a speedy trial are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to defendant resulting from the delay. *Barker v. Wingo*, 407 U.S. 514, 33 L.Ed.2d 101, 92 S.Ct. 2182 (1972); *State v. Hill*, 287 N.C. 207, 214 S.E.2d 67 (1975); *State v. Gordon*, 287 N.C. 118, 213 S.E.2d 708 (1975), *death sentence vacated*, 428 U.S. 903, 49 L.Ed.2d 1207, 96 S.Ct. 3206 (1976); *State v. Johnson*, 275 N.C. 264, 167 S.E.2d 274 (1969).

**[2]** Whether an accused has been denied a speedy trial must be answered in light of the facts in each particular case. The instant case involves a delay of less than eight months from time of defendant's arrest to commencement of his trial. The length of the delay is not *per se* determinative, and there is no showing that the delay was purposeful or oppressive or by reasonable effort could have been avoided by the State. Inherent in every criminal prosecution is the probability of some delay, *State v. Johnson, supra,* and for that reason the right to a speedy trial is necessarily relative. *State v. Neas*, 278 N.C. 506, 180 S.E.2d 12 (1971). Delays in violation of the constitutional right to a speedy trial are those undue delays which are arbitrary and oppressive or the result of deliberate prosecution efforts "to hamper the defense." *Barker v. Wingo, supra; State v. Spencer,* 281 N.C. 121, 187 S.E.2d 779 (1972).

**[3,4]** The burden is on an accused who asserts denial of his constitutional right to a speedy trial to show that the delay was due to the neglect or willfulness of the prosecution. *State v. Hill, supra; State v. Gordon, supra; State v. Johnson, supra.* In the case before us, de-

fendant has failed to carry the burden. To the contrary, the record indicates that a portion of the delay in the prosecution of this case was due to defendant's motion for a mental examination to determine his competency to proceed. Further delay was occasioned when his counsel withdrew due to irreconcilable differences between counsel and defendant. A short delay on another occasion was caused by the inability of an officer to be present. Finally, the case was calendared one or more times for trial but not reached, apparently due to the length of the calendar. All such reasons have been recognized consistently as valid justification for delay. *See Barker v. Wingo, supra; State v. Hill, supra; State v. Gordon, supra.* We therefore conclude that the length of the delay was not unreasonable. He has shown no prejudice resulting from the delay of which he now complains. Defendant's first assignment of error is overruled.

**[5]** Defendant moved to suppress his in-court identification by Mrs. Brooks because (1) it was based on an illegal pretrial one-man lineup and (2) the one-man lineup was conducted at a time when defendant was without counsel and had not knowingly and intelligently waived his right to counsel. Defendant argues he was thus identified at the home of Mrs. Brooks in the absence of counsel and under suggestive circumstances amounting to a denial of due process which renders the evidence incompetent. The motion to suppress was denied and this constitutes his next assignment of error.

An in-custody confrontation for identification purposes requires that: (1) the accused be warned of his constitutional right to the presence of counsel during the confrontation; (2) when counsel is not knowingly waived and is not present, the testimony of witnesses that they identified the accused at the confrontation must be excluded, and (3) the in-court identification of the accused by a witness who participated in the pretrial out-of-court confrontation must likewise be excluded unless it is first determined on *voir dire* that the in-court identification is of independent origin and thus not tainted by the illegal pretrial identification procedure. Failure to observe these requirements is a denial of due process. *United States v. Wade,* 388 U.S. 218, 18 L.Ed.2d 1149, 87 S.Ct. 1926 (1967); *Gilbert v. California,* 388 U.S. 263, 18 L.Ed.2d 1178, 87 S.Ct. 1951 (1967); *State v. Smith,* 278 N.C. 476, 180 S.E.2d 7 (1971); *State v. Rogers,* 275 N.C. 411, 168 S.E.2d 345 (1969), *cert. den.,* 396 U.S. 1024, 24 L. Ed. 2d 518, 90 S.Ct. 599 (1970).

Furthermore, it is established law that lineup and confrontation procedures so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification violate due process and are constitutionally unacceptable. *State v. McPherson,* 276 N.C. 482, 172 S.E.2d 50 (1970); *State v. Austin,* 276 N.C. 391, 172 S.E.2d 507, *cert. denied,* 400 U.S. 842, 27 L.Ed.2d 78, 91 S.Ct. 85 (1970).

The trial judge conducted a *voir dire* on defendant's motion to suppress. The State examined Mrs. Brooks and Officer Jack Parks. Mrs. Brooks testified in pertinent part that when she awoke on the night in question the man was standing over her with his cold hand on her naked thigh; that she could not see his face at that time; that he whirled around and left through the window; that she watched him crawl on his knees to the corner of her house where he stood up and then ran; that she was able to see his face when he stood up because there was a street light located in the back yard; that the person who stood up at the corner of her house was Rayboy; that she had no doubt about her identification of the man as Rayboy; that she recognized him and told Officer Parks later that night it was Rayboy; that when the officers later brought defendant back to her home that night it was the same person she knew and recognized as Rayboy; that he was wearing real light clothing and had a bush or Afro hairdo; that when the officers brought defendant to her house within less than an hour after the burglary, defendant was dressed the same way and was the same individual she had seen standing at the corner of her house earlier.

Officer Jack Parks testified *voir dire* that he arrived at the Brooks home at approximately 2:52 a.m. on the night of 2 September 1979; that Mrs. Brooks advised him a black man had entered her bedroom window and when she awakened he was standing over her with her nightgown around her waist and one of his hands on her thigh; that the black man was dressed in light colored clothing, limped, and was called Rayboy; that she stated she knew it was Rayboy because she had seen him in the neighborhood; that he knew defendant Timothy Tann was known as Rayboy; that he thereupon went to the home of defendant's mother who admitted him; that defendant was lying on the couch fully clothed except for his shoes and agreed voluntarily to accompany the officers to the Brooks residence after they told him they were investigating a burglary; that Mrs. Brooks was in her bedroom when they brought defendant

into the house and took him into the bedroom; that after she looked at Timothy Tann, they took him into the living room and at that point Mrs. Brooks indicated that he was Rayboy. Officer Parks further testified that defendant was dressed in a light colored shirt and off-white pants and that the pants were wet below the knees with grass stains on the knees. Officer Parks said defendant had not been arrested and was not in custody at the time and consequently had not been warned of his constitutional rights.

Defendant offered no evidence on *voir dire.*

The trial court made findings of fact substantially in accord with the testimony of the State's witnesses. They include the following pertinent findings:

5. The area of the yard of said dwelling house is lit by a street light located behind the house and a street light located in front of the house.

6. Annie Pearl Brooks observed the person standing by the corner of her house to have been wearing a pea green light colored shirt, light colored pants and an Afro hairdo and that the person was a person known to her as "Rayboy."

7. The Rocky Mount police . . . within one hour . . . picked up Timothy Ray Tann and brought him to the home of the witness Annie Pearl Brooks.

8. Upon leaving Mrs. Brooks' house after getting the description Officer Parks went to the home of a person he knew as "Rayboy," also known as Timothy Ray Tann, and found the defendant lying upon a couch with light colored pants wet below the knees, and with grass stains on the knees, a light colored shirt and no shoes.

. . .

10. Timothy Ray Tann agreed to accompany the police and was not formally placed under arrest.

. . .

12. Timothy Ray Tann was thereupon taken into the residence and into the bedroom of the witness Brooks and the witness Brooks was given an opportunity to observe

Timothy Ray Tann with the light off.

13. The witness, Annie Pearl Brooks identified Timothy Ray Tann as being the person in her house earlier.

14. Subsequent to the said identification Timothy Ray Tann was placed under arrest.

Based on the findings of fact, the trial judge concluded as a matter of law: (1) that Timothy Ray Tann was not under arrest or in any way detained by the police against his will when he was taken to the Brooks residence; (2) that defendant voluntarily accompanied Officer Parks to the Brooks residence; (3) that the officers were conducting an on-the-scene investigation at the time Timothy Ray Tann was taken to the Brooks residence to determine whether the "Rayboy" described by Mrs. Brooks was in fact Timothy Ray Tann, a person known by Officer Parks to be called "Rayboy"; (4) that the one-man show-up was conducted by Officer Parks during his investigation and was not so unnecessarily suggestive as to be conducive to an irreparable mistaken identification of defendant or in a manner which violated defendant's constitutional rights; (5) that defendant's right to counsel had not yet attached because defendant had not been placed under arrest; (6) that defendant's in-court identification by Mrs. Brooks is based upon her observation of him at the time or shortly after the alleged offense when the person she knew as "Rayboy" crawled to and stood up at the corner of her house; and (7) the in-court identification of defendant and evidence of his identification at the show-up are admissible into evidence.

There is plenary competent evidence in the record to support the findings of the trial judge. Such findings are conclusive when supported by competent evidence and no reviewing court "may properly set aside or modify those findings if so supported by competent evidence in the record." *State v. Gray,* 268 N.C. 69, 79, 150 S.E.2d 1, 8 (1966), *cert. den.,* 386 U.S. 911, 17 L.Ed.2d 784, 87 S.Ct. 860 (1967).

Since defendant was not in custody, the rules gleaned from *United States v. Wade, supra,* and *Gilbert v. California, supra,* governing in-custody confrontations for identification purposes do not apply in this case. Nevertheless, if it is conceded *arguendo* that defendant was in custody, no denial of due process has been shown and the evidence defendant moved to suppress was properly admitted.

It is quite evident that the in-court identification of defendant by Mrs. Brooks was independent in origin, stemming from her recognition of him when he stood up at the corner of her home immediately after the burglary, and was not influenced by the show-up. Mrs. Brooks knew the intruder as "Rayboy." The officers merely supplied Timothy Ray Tann while Mrs. Brooks independently identified the man bearing that name as the man she knew as "Rayboy." There is ample evidence to support the finding that the in-court identification was independent in origin. She knew the man long before the officers produced him. In all events, admission of evidence concerning the one-man show-up was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824 (1967); *Gilbert v. California, supra; State v. Taylor,* 280 N.C. 273, 185 S.E.2d 677 (1972). Unless there is a reasonable possibility that the evidence complained of might have contributed to the conviction, its admission is harmless. *Fahy v. Connecticut,* 375 U.S. 85, 11 L.Ed.2d 171, 84 S.Ct. 229 (1963). We see no reasonable possibility that the one-man show-up here could have led to a mistaken identification or contributed to defendant's conviction. After all, the victim had recognized defendant and told the officers that Rayboy was the culprit. This assignment of error has no merit and is overruled.

[6]  After Mrs. Brooks had informed the officers that defendant was the burglar in her bedroom on the night in question, Officer Parks took defendant to the police station and advised him of his *Miranda* rights. Following the reading of defendant's constitutional rights, defendant said he understood them and stated he would sign a waiver, which he did. Defendant was then interrogated for about five minutes at the police station and, in response to questions, stated that on the night in question he had been to a cousin's house located on Goldleaf Street and thereafter had gone to a place known as "Brown's." Questioning by the officers then ceased and defendant was taken by automobile to a magistrate's office located some distance from the police station and was not further questioned by the officers. After a warrant was issued by the magistrate and served on defendant, he was taken by car back to the police station. No questions were put to him in the automobile during the trip from the magistrate's office to the police station. During the course of the trip, however, defendant volunteered the following statement: "Man, you can't do this to me. That lady don't know what time I broke into her house."

During the course of the trial defendant moved to suppress the officer's testimony regarding the quoted statement by defendant. The jury was excused and the trial judge conducted a *voir dire* during which Officer Parks testified as a witness for the prosecution. Defendant offered no evidence on *voir dire*. At its conclusion, the trial judge made findings of fact substantially in accord with the foregoing narration. The court concluded that defendant's statement was volunteered after he had been warned of his constitutional rights, including the right to counsel, and had freely and understandingly waived the same. The incriminating statement was thereupon admitted into evidence over defendant's objection. This constitutes his next assignment of error.

It is settled law that where, as here, the findings of the trial judge are supported by competent evidence, they are binding and conclusive on appellate courts in this jurisdiction. *State v. Morris*, 279 N.C. 477, 183 S.E.2d 634 (1971); *State v. Harris*, 279 N.C. 307, 182 S.E.2d 364 (1971); *State v. Gray, supra*. The challenged evidence was competent and therefore properly admitted. Seemingly, it has very little probative value but its weight is for the jury and does not affect its admissibility.

Evidence of defendant's guilt is strong. Various circumstances, including grass stains on the knees of his pants and his positive identification by Mrs. Brooks who knew him before the crime was committed, plus the fact that he was apprehended within thirty minutes, point unerringly to defendant as the burglar. In any event, the jury believed the State's evidence. Defendant has failed to show prejudicial error in his trial. The verdict and judgment must therefore be upheld.

No error.

Justice MEYER took no part in the consideration or decision of this case.